Cyrus M. Sanai, SB#150387
SANAIS
433 North Camden Drive
Suite 600
Beverly Hills, California, 90210
Telephone: (310) 717-9840
cyrus@sanaislaw.com

UNITED STATES DISTRICT COURT OF THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYRUS SANAI, an individual | ) Case No.: CV 18-2136 |
| Plaintiff, | ) |
| vs. | ) **COMPLAINT  FOR:** |
| D. JOSHUA STAUB, an individual; FREDERICK BENNETT, an individual; PHU CAM NGUYEN, an individual; CHRISTOPHER MCINTIRE, an individual and DOES 1 through 10, inclusive, | ) (1) RELIEF UNDER 42 U.S.C. §1983; ) (2) DECLARATORY JUDGMENT ) ) ) |
| Defendants. | ) JURY DEMAND |

-1-
COMPLAINT

Plaintiff Cyrus Sanai hereby alleges as follows:

**JURISDICTION**

1.     This Court has jurisdiction pursuant to 28 USC §1331.  Venue is proper in this district and Division because the Plaintiff and all Defendants identified below are residents of Los Angeles County or Riverside County.

**THE PARTIES**

2.     Plaintiff, CYRUS SANAI ("Sanai"), is an attorney admitted to practice in California and various federal courts who resides in the County of Los Angeles, State of California.

3.     Defendant, D. JOSHUA STAUB  ("STAUB"), is an attorney who resides in the County of Los Angeles, State of California.  He has been appointed as special prosecutor in the case of *United Grand Corporation v. Malibu Hillbillies,* BC554172 ("*UGC*").  Prior to his appointment, he represented defendants Marcie Stollof and Malibu Hillbillies in *UGC*.  He successfully moved to be relieved as counsel when, Plaintiff alleges on information and belief, his clients objected to his secret engagement on behalf of BENNETT to attack Plaintiff.

4.     Defendant, FREDERICK BENNETT ("BENNETT"), is an attorney who is the lead "Court Counsel" for the Los Angeles County Superior Court.  He lives and works in the County of Los Angeles, State of California.  He represents and has represented current judges of the Superior Court and a judge who was elevated to the Court of Appeals, Elizabeth Grimes ("Grimes.")  Defendant, PHU CAM NGUYEN, ("NGUYEN"), is a Court Counsel who has since 2015 been assigned some of the duties of BENNETT.

5.     Defendant CHRISTOPER A. MCINTIRE ("MCINTIRE") is an attorney who has been engaged to represent the Los Angeles County Superior Court and Grimes in *UGC* for purposes of opposing any efforts to have them provide documents or testimony.  He resides in

Riverside County and works for the Riverside County law firm Cummings, McClorey, Davis, Acho & Associates.

## COMMON ALLEGATIONS

6.      On or about 1999 the Los Angeles County Superior Court created a new internal division, "Court Counsel."  Prior to 1999 the legal needs of the Los Angeles County Superior Court were met by the Los Angeles County Counsel.  One of the primary duties of the Los Angeles County Counsel was defending the Los Angeles County Sherriff's departments from lawsuits in state and federal court arising from violation of civil rights and outright criminal conduct.  In 1998, Lee Baca, a corrupt leader in the Sherriff's department, was elected Los Angeles County Sheriff.  The County Counsel's office was, throughout the four terms to which Baca was elected, a critical facilitator of the organized crime operation which Baca created within, and which controlled, the Sherriff's department.  Certain judges of the Los Angeles County Superior Court who had been previously employed in the County Counsel's office realized that the simultaneous representation of the Court by the same attorneys who defended the conduct of Baca and his lieutenants from criminal and civil investigations and lawsuits would entangle the Superior Court in Baca's corrupt conduct.  These same judges also believed that continued use of the same counsel made the Superior Court vulnerable to the exercise of pressure from Baca's office, and if Baca were ever exposed and criminally prosecuted, might result in Baca trading knowledge of misconduct in the Superior Court for leniency.

7.      The first "Court Counsel" hired was defendant BENNETT.  Once the authority to set up a separate legal function within the Superior Court was approved, the same cabal of judges created two other functions for his office that County Counsel had never performed.  The first function was to completely centralize the disposition of all motions for disqualification with BENNETT.  He became the internal arbiter of whether or not a trial court judge was required to disqualify himself or herself under the peremptory and for-cause procedures set forth in Cal. Code Civ. Proc. §170.1-6.  If a disqualification statement for cause were presented, BENNETT was originally directed to appear as counsel for the judge and fight the motion.  After Plaintiff

challenged that practice, BENNETT would ghost write standard responses.  The second function of the office was to designate and track individuals and entities which challenged the conduct of the judges of the Court or who embarrassed the judges of the Court by reversing trial court judges repeatedly in the same or related cases or successfully disqualified the judges for cause.  The responsibility of Court Counsel to handle "vexatious or difficult" litigants is part of the official description of the job.

8.      Court counsel are technically self-employed lawyers who bill for time as inside-outside counsel.  Where necessary Court Counsel will hire law firms to represent the interests of the Superior Court.  Much of this work is typical legal work for any governmental entity.  However, the Superior Court will, when its interests in a case are threatened, engage counsel to tell the Superior Court judge what to rule.  Defendant MCINTIRE is one of such counsel.

9.      When a litigant or a lawyer is identified as a "vexatious or difficult" litigant or lawyer, Court Counsel will open up a file and monitor the activities of such litigant or lawyer, with the aim of ensuring that the litigant or lawyer does not succeed in any cause brought before the Superior Court, and to look for opportunities to designate the litigant as a "vexatious litigant" formally or informally, or to concoct fake charges of litigation misconduct to impose punitive measures on them.  This practice includes contacting and coordinating with lawyers in private practice and who represent government entities to jointly attack targeted lawyers and litigants.

10.     The primary ground for designation as a "difficult" litigant or lawyer are to (1) bring repeated disqualification motions against a judge or judges for cause; (2) obtain a reversal of a Superior Court judge which humiliates the judge, impairs the judge's record for purposes of elevation to a different court, or results in a referral to California Judicial Performance Commission; (3) disqualify a judge for cause at the appellate level; or (4)  oppose the appointment of any sitting Los Angeles County Superior Court judge to a different position.  If a litigant or lawyer successfully removes a judge for cause at the appellate level, such litigant or lawyer is branded as a "Special Case" and is the subject of regular strategizing meetings within the Superior Court to search for opportunities to injure or obstruct the abilities of a Special Case to conduct litigation in the Superior Court.

11.     In order to impose punitive measures on a Special Case or ordinary "difficult" litigant or lawyer, the Court Counsel must act through judges and commissioners who are assigned cases involving such targets.  Of the approximately five hundred judicial officers in the Los Angeles County Superior Court, a significant minority will never cooperate with punitive measures, and a majority cannot be trusted to take measures such a falsifying the judicial record or coercing Court Clerks to cooperate.  However, none of the Superior Court judges will actively interfere with the exercise of the Court Counsel's powers due to the peculiar authority of the Los Angeles County Superior Court administration over judges livelihoods and working conditions.

12.     Unlike a federal district court, where the working conditions and duties of federal court judges are largely the same, the day to day job of a Los Angeles County Superior Court judge or commissioner can be vastly different.  First, the locations of courthouses throughout the County of Los Angeles means that depending on the assignment, a judgment may have a daily commute of less than 30 minutes to over three hours.    Second, Superior Court judges can have assignments that constitute literally different jobs.  Some judges only handle criminal trials; others handle only criminal motions; others handle only civil motions; some handle civil cases as independent calendar judges and deal with all pre-trial and trial matters; several judges only handle unlawful detainers; some judges handle only small claims; all family court matters are handled by special family court judges; all probate matters are assigned to specific probate judges.  Of the various assignment, three are deemed to be especially desirable:  independent calendar civil assignment; settlement judge assignment; and assignment to the Appellate Division.   Any judge who obtains one of these three assignments can expect to retire and move on to a lucrative career as an arbitrator or mediator.  For this reason assignment to these particular calendars is deemed to be a prize, and satisfying the demand to be assigned to these positions is how judges obtain the votes to become assistant presiding, and then presiding judges.   Judges who are disfavored or who are viewed as not cooperative can be assigned to departments such as traffic court or small claims which are universally viewed as punishment.

13.     The culture of the Los Angeles County Superior Court has another major difference from federal courts.  More than half of the judges previously worked as prosecutors or for county

counsel or as counsel for any of cities in Los Angeles.  Because of the endemic corruption that plagues the Los Angeles County Sheriffs Department and the polices forces of the various cities (most notably the City of Los Angeles), the judges who previously worked in such jobs view civic corruption as an ordinary feature of government that is impossible and undesirable to eliminate. As for appellate oversight, unlike every other appellate court in the state, the judges from court which oversees the Los Angeles County Superior Court, Divisions 1 through 5 and 7-8 of the Second Appellate District, were with one exception previously judges in the Los Angeles County Superior Court.

14.     Grimes entered the legal profession as an attorney for Gibson Dunn & Crutcher. She married a partner, Ron Toews, while an associate.  Toews left the firm in 1985 and became a wealthy developer and operator of apartment buildings.  Grimes had no client base, but she was made a partner after ten years.  As a "service partner" she was assigned primarily to work on Gibson's practice before the California New Motor Vehicle Board, which regulates disputes between car and vehicle dealers and manufacturers that grant dealerships.  Though possessed of a sterling academic record and a facile writer, Grimes had one prominent defect as an attorney (and later) judge:  she would, when analyzing case law, repeatedly focus on portions of legal decisions that stated the legal principle she wanted to argue applied, without ever reading the rest of the decision.  She thus could make spectacular legal blunders by citing legal opinions that actually held the OPPOSITE of what she was trying to convince a court to rule.    In a case involving Nissan, one of Grimes' legal briefs cited a case for a proposition that held the opposite of what it actually said—as she failed to bother to read the portion of the decision applying an exception to the rule she quoted—and as a result Nissan lost a critical proceeding and fired Gibson Dunn.

15.     The outcome of this debacle was that the Gibson Dunn management elected to try to find Grimes a soft landing, rather than firing her outright.  The considerable resources of the firm were devoted to preparing her application for a position in the Los Angeles County Superior Court.  She was so appointed in 1997.  She was initially given a criminal court assignment and quickly developed a reputation as a shoot-from-the-hip judge wildly biased in favor of the

1    prosecution.  As a criminal court judge and later a civil court judge, she was reversed on appeal at

2    double the average rate for California trial court judges.

3           16.     In 1998 Plaintiff Cyrus Sanai, a graduate of Harvard College and UCLA Law

4    School, returned to the United States after a career working abroad as an attorney and English

5    solicitor.  His first job was with a major California law firm that hired him in its Irvine California

6    office.  Sanai obtained a lease at a complex in Newport Beach owned by an affiliate of The Irvine

7    Company.  After expiration of his original lease, he accepted a new lease offer at a lower price

8    than his original lease.  The management of the complex attempted to renege on the lease, and

9    Sanai stood on his deal.  Unable to resolve the dispute, he left the complex and moved to Santa

10   Monica.  The management company which operated the complex new that it could not sue Sanai,

11   so it decided to extort a payment by hiring the U.D. Registry, Inc. ("UDR") , a company owned by

12   Harvey Saltz, his wife and his children to make a false credit report, using UDR's own reporting

13   account, that Sanai owed UDR money and the the debt was "in collection."

14          17.     After discovering that his credit had been slandered and failing to resolve the

15   matter with UDR's president, Harvey Saltz, Sanai sued UDR in December 2000.  UDR engaged

16   as its counsel one of its owners and Saltz's son, Michael Saltz.  The Saltz's engaged in scorched

17   earth litigation tactics including three successive anti-SLAPP motions and multiple appeals.  In the

18   18 years that the case has been litigated, UDR and its successors have spent millions because the

19   case posed the threat of destroying the consumer credit reporting system as it existed prior to

20   2000.

21          18.     The threat that Sanai's lawsuit created was that it would (and in fact eventually did)

22   establish a rule that persons reporting consumer credit information to consumer credit reporting

23   agencies could be held liable under California law for making any inaccurate or incomplete

24   statement in the first instance.  Under the federal law, persons who report false, inaccurate or

25   complete information have no liability; liability only attaches if a consumer complains to the

26   agency, and the agency does an improper investigation.  However, if the person reporting

27   information to the agency lies or commits fraud, there is no effective recourse under the law,

28

because of pre-emption provisions which only exempt the California and Massachusetts consumer reporting statutes.

18.    In the first round of the litigation, the original trial court judge assigned to the case, denominated *Sanai v. Saltz,* BC235671, denied an anti-SLAPP motion but held that Sanai's case had no merit.  The junior Saltz filed an appeal of the order denying the motion, then proceeded to litigate the case on the merits even though he  knew the matter was automatically stayed.  The reason he did this was because he knew that the original trial court judge, a David Horowitz, wanted to dismiss the case.  However, the junior Saltz could not find the argument that would get the case dismissed.  Eventually he filed a summary judgment motion while discovery matters were ongoing and the judge dismissed the case using a rationale that, to this day, no one can explain and which is utter gibberish.  UDR never itself argued the "reason" stated by Horowitz.   Horowitz retired before judgment was entered and was replaced by Grimes.

19.    Sanai research Grimes' background and discovered that she was co-owner of small empire of apartment buidlings in Los Angeles developed by her husband, Ron Toews.  She and her husband had a direct financial interest in seeing Sanai's lawsuit be dismissed, and indeed her husband's buildings used UDR's services.  Sanai filed a disqualification for cause statement in 2003 against Grimes based on her financial interest, and the fact that her law firm had represented a defendant that UDR has forced into the litigation, The Irvine Company.   BENNETT formally appeared in the litigation as attorney for Grimes and filed an opposition.  The case was transferred for determination in the Orange County Superior Court by Judge McEachen.  The disqualification statement that McEachen reviewed was not the disqualification statement filed by Sanai, but a document fraudulent altered by the Superior Court clerk's office under the supervision of BENNETT.  Judge McEachen denied the  disqualification, making assertions about the contents of the altered disqualification document that did not reflect the facts asserted and demonstrated by Plaintiff.

21.    Grimes imposed six figure attorney fees against Sanai afgter allowing Saltz's firm relief from missing the deadline for filing.  This ruling was based on Grimes' hatred of Sanai.  As the Court of Appeal pointed out : "The trial court commented:  "Plaintiff has proliferated needless,

baseless pleadings that now occupy about 15 volumes of Superior Court files, not to mention the numerous briefs submitted in the course of the forays into the Court of Appeal and attempts to get before the Supreme Court, and not one pleading appears to have had substantial merit.  The genesis of this lawsuit, and the unwarranted grief and expense it has spawned, are an outrage."".  *Sanai v. The U.D. Registry, Inc.,* B170618 February 16, 2005 Cal. App. 2 Dist. unpublish.) at 31 fn. 36.   In this appeal, Justice Michael Perluss of  Division 7 of the Second Appellate District took apart Judge Grimes legal analysis step by step.  In doing so, it mocked Grimes reflexive citation of cases that contradict her analysis:  "The suggestion the holding in *Sanabria v. Embrey, supra,* 92 Cal.App.4th 422, is limited to voluntary dismissals from which there is no right of appeal, and therefore does not apply in this case because Mr. Sanai could appeal from the final orders of dismissal entered in favor of the Irvine Entities, even if otherwise intelligible, is belied by the analysis in Sanabria itself….."  *Sanai v. The U.D. Registry, Inc.,* B170618 (February 16, 2005 Cal. App. 2 Dist. unpublish.) at 18-19 fn 22.

22.     In the appeal addressing the final judgment, Sanai reversed every single ruling of the trial court adverse to him.  *Sanai v. Saltz* 2005 WL 151401 (Cal.App. 2 Dist). After again quoting the language of Grimes, castigating Sanai, it disqualified Grimes in the interests of justice under Code Civ. Proc.§170.1(c).

23.     After Sanai prevailed, he wrote a letter to Grimes dated June 29, 2005 demanding that she retract and apologize for her statement castigating him, as Sanai knew it would be used against him in other contexts.    Grimes was infuriated, not only because of her humiliation, but also because she was in 2005 being evaluated by the Judicial Nomination Evaluation Commission (the "JNE Commissio") for elevation to the Court of Appeal.    In California the JNE Commission issues letters to randomly selected attorneys asking for feedback on judicial nominees and prepares a report.  Grimes' application received significant negative responses from defense counsel who had appeared before her when she was assigned to criminal courts, and her nomination was in serious trouble.  The disqualification for cause made further progress on her nomination impossible.   Grimes demanded that Sanai be identified as a Special Caseby Court

Counsel and that full efforts be made to (1) prevent Sanai from succeeding in *Sanai v. Saltz* on remand, and (2) to disbar or otherwise cripple Sanai as an attorney.

24.     BENNETT filed a bar complaint dated July 7, 2005, claiming, among other things, that Judge Grimes was a "represented party" and that SANAI had violated professional responsibility rules by contacting her ex parte without notice to him, as her counsel, or the other side.

25.     A presiding judge who was a close friend of Grimes agreed to re-assign *Sanai v. Saltz* to a judge selected by Grimes.  After conducting research, Grimes picked Terry Green.  Terry Green was a former prosecutor who had prosecuted cases tainted by sheriff's deputy misconduct and by his violation of his prosecutorial *Brady* obligations.  Just as important, Green's wife, Leslie Green, worked for a small law firm that counted a company which purchased the U.D. Registry, Inc., as a client.  Grimes and the presiding judges told Terry Green that if he and his wife agreed to act as conduits of information and advice through oral communications, Grimes and her husband, aided by the political connections of the judicial administration, would seek to have Terry Green's wife Lesley Green appointed as a judge.

26.     The California Bar Association investigated BENNETT's first bar complaint and found it frivolous and unsupported by the actual facts.  At the instruction of Grimes and the presiding judge at the time, BENNETT began looking for other grounds to file bar complaints against Sanai.  He contacted the junior Saltz, who put him in contact with an attorney, William Gibbs, who was then litigating a family dispute against Sanai in Washington State.  In an email dated August 9, 2005, BENNETT acknowledged filing a bar complaint against Sanai on behalf of Grimes and the Superior Court, and agreed to file go directly to the Chief Trial Counsel of the California Bar Association to get Sanai disbarred.  BENNETT directly contact the Chief Trial Counsel, complained about the inaction on the first complaint, and attached his emails correspondence with Gibbs.  Contrary to California Court Rules, no notice of this action by the Superior Court was given to Sanai and he would not learn about it until 2015.  The Bar Association ignored this illegal, secret report.

27.     Sanai was awarded costs by the Court of Appeal in *Sanai v. Saltz* and filed a memorandum of appellate costs that the junior Saltz failed to timely attack.  Saltz's clients refused to pay, so Sanai began enforcement proceedings, and then filed a memorandum of costs for enforcement costs in 2006.  This document was served by Express Mail on the senior Saltz and Saltz's clients as required under California's Enforcement of Judgment Law.  The junior Saltz was forwarded a copy of the memorandum of costs with adequate time to file a motion to attack the memorandum.  Instead, he contacted BENNETT (either directly or through the Greens) and asked that the memorandum be quashed by the clerk.  He was put in touch with the clerk and gave his directions—that the document should be quashed for failing to identify the agents for service of process.

28.     Saltz then bragged about getting the clerk to reject the memorandum in a phone call to Sanai.  Sanai traveled to the Court and demanded to speak to the clerk.  She told Sanai that she had been instructed that she had to know the names of the agents for service of process for the defendants other than Harvey Saltz.  Sanai stated that he did not serve the documets, but because he had signatures, he could state who actually received the packages.  The clerk said that she needed the agents for service of process.  Sanai happened to know who those were. He was provided with a piece of paper and he wrote them down. The clerk then entered judgment of the costs in favor of Sanai.

29.     The junior Saltz soon discovered that his behind the scenes shenanigans had failed. He gave Sanai ex parte notice of a motion, then sandbagged Sanai by providing a motion to strike the memorandum of costs (but not vacate the judgment for costs) which was different from the notice he gave.  When Sanai appeared in Court, the Judge Terry Green had already read Saltz's papers and spoken with the clerk, which he acknowledged in open court statements captured by court reporter.  Judge Green  then held an evidentiary hearing.  Despite asking leading questions of the clerk, she refused to state that she remembered the contents of the conversation or what happened.  Judge Green nonetheless struck the memorandum, without doing anything to the judgment.

30.     Sanai forced Green to vacate the order based on a recording of Saltz's notice.  ON a noticed motion Green sent the  Sanai then enforced the judgment. Green found that the conduct of Sanai was in bad faith and constituted illegal alteration of court records.  Saltz brought motions to force Sanai to acknowledge satisfaction of the judgment (the original amount which had then been paid) and Sanai resisted.

31.     While this was ongoing Grimes continued to make embarrassingly inept rulings that if properly attacked would continue to undermine her quest to be appointed to the Court of Appeal.  In 2007 Terry Green was rewarded by the nomination of wife to the Superior Court to replace a trial court judge who resigned to accept a temporary appointment to the Court of Appeal for purposes of affirming an erroneous judgment made by Grimes.  Grimes was also appointed temporarily to the Court of Appeal to give burnish her credentials at around that time.

32.     Judge Terry Green dismissed Sanai's complaint without allowing discovery. His order was reversed in a published case that affirmed that right of a consumer to sue under California's consumer credit reporting act for false, misleading, inaccurate or incomplete reports to consumer credit reporting agencies.  This case, along with a simultaneously decided federal decision, resulted in wholesale changes in consumer credit reporting that continue to reverberate.

32.     Judge Terry Green was disqualified after his reversal and the case was moved to a new judge sitting temporarily in 2009, as the Superior Court administration was not able to find a judge to take more extreme measures against Sanai.  Saltz filed a third anti-SLAPP motion, lost, and then filed an appeal to the Court of Appeal.

33.     In 2010 Grimes was told that she would finally obtain nomination for an appointment to the Court of Appeal.  However, Grimes and BENNETT knew that Sanai would oppose it and attack her judicial temperment.  To head of this possibility, BENNETT gave Saltz directions to file, in the Superior Court, a motion to have Sanai declared a vexatious litigant.  The motion would be directed to Debre Katz Weintraub.  Weintraub was promised eventual elevation to the presiding judgeship if she took the necessary steps to have Sanai declared a vexatious litigant (she is now presiding judge for the Civil Judges).  However, the junior Saltz botched the timing of service of the motion, and served the document too late to be heard prior to the

announcement of Judge Grimes' nomination.  The junior Saltz went in ex parte demanding an order shortening time for service without explaining the necessity for doing so.  Sanai opposed the motion on the grounds that the case was stayed and any such motion to have Sanai declared a vexatious litigant had to be brought in the Court of Appeal.  Weintraub granted the ex parte motion, Sanai filed a petition for supersedeas which was granted and the vexatious litigant motion was effectively denied.  Sanai filed a motion to disqualify Weintraub, and she agreed to remove herself.

34.     While this was ongoing, Grimes' nomination to the Court of Appeal was announced.  Sanai filed an opposition with the Commission on Judicial Appointments including an analysis showing that her reversal rate was DOUBLE the average in California.  He also attacked her judicial ethics and temperament based on her conduct in *Sanai v. Saltz* and her filing a completely meritless bar complaint—at that time, Sanai only knew of the first complaint.

35.     BENNETT filed a response to the Commission on Judicial Appointments  stating that Judge Grimes had nothing to do with the complaint to the Bar Association, and that the complaint had been solicited by the Chief Trial Counsel.    Sanai filed judicial misconduct complaints against Green and Grimes, which were ignored.

36.     At this point Sanai's disbarment became the top priority of the Court Counsel.  When Sanai again won the appeal and the case was remanded, it was assigned to judge Kevin Brazile.  Brazile was promised by the Superior Court administration that if he successfully took down Sanai, he would be appointed presiding judge.  Judge Brazile was, prior to his appointment, Sheriff Lee Baca's most skilled lawyer in the County Counsel's office—indeed, he was given a special award by Baca's criminally corrupted deputy's association when Brazile left the County Counsel's office to become a judge.  Brazile, along with Baca's personal counsel, Dalila Corral Lyons, were responsible for keeping  the criminal corruption in the Sheriff's department under wraps for the first decade of the millennium.

37.     Saltz was instructed to refile the motion to declare Sanai a vexatious litigant and it was granted by Brazile.  The Court of Appeal immediately stayed the order, and reversed it.  Sanai moved to disqualify Brazile, who consented to the motion.  Judge Brazile's consent to

disqualification was overturned by the Superior Court administration, and Judge Brazile was instructed to dismiss the complaint.  He did so as to some defendants, but was again overturned by the Court of Appeal.  Sanai again sought to disqualify Brazile, and this time the Court of Appeal issued an alternative writ to do so.  The Superior Court administration saw the writing on the wall, and appointed Brazile as civil Presiding Judge and he is on his way to becoming Presiding Judge for the entire court.

38.     Brazile appointed Judge Lyons to take his place.  Judge Lyons refused to allow discovery concerning the time period during which BENNETT was communicating with Saltz. She dismissed the complaint, and that order is again on appeal.

39.     While proceedings were ongoing in the Superior Court, Judge Grimes had utilized her contacts in the federal judiciary to cause Judge Alex Kozinski to attack Sanai in print in 2005. Sanai filed misconduct complaint against Kozinski, pointing to his use of his private server to distribute derogatory information about Sanai.  Circuit Judge Schroeder, then the Chief Judge, issued an order in 2006 finding that Kozinski did not have any private server.  Sanai filed judicial misconduct complaints against Kozinski and Schroeder, then discovered the pornography directory of Judge Kozinski's server while the Ninth Circuit Judicial Council was ignoring the second judicial misconduct complaint.  Sanai revealed this information to the Los Angeles Times which printed an article.  Kozinski filed a misconduct complaint against himself, which resulted in a travesty of an investigation. Sanai filed additional misconduct complaints against Kozinski, Schroeder, and other judges who were participating in related misconduct, including covering up his distribution of pornography.  The Ninth Circuit Judicial Council issued an order reprimanding Sanai, then Circuit Executive Cathy Catterson put maximum pressure on the California Bar Association to prosecute Sanai for misconduct.

40.     Jane Kim, the newly appointed Chief Trial Counsel, overruled prior Chief Trial Counsel's and instigated proceeding against Sanai as requested by the Ninth Circuit Judicial Council and regarding *Sanai v. Saltz.*  The Judicial Council refused to provide any records concerning Sanai's complaints and refused to allow anyone from the Court to testify.  After presentation of the Chief Trial Counsel's case in 2014, in 2015 the California Bar Court dismissed

the charge, finding that to the extent that it could determine the contents of the misconduct complaints filed by Sanai, they were clearly justified. As the world knows, Sanai's additional accusations against Kozinski which the Judicial Council refused to investigate were last year confirmed by clerks and one other federal court judge, and Kozinski resigned in disgrace.

41. Sanai was also tried regarding his conduct regarding the memoranda of costs. The clerk whose testimony was found by Judge Green to support a finding of tampering with the judicial records was called as a prosecution witness and she completely recanted her testimony, denying that any of the events which she testified had occurred between Sanai and her had actually occurred, and further stating she could not remember what had occurred. She added as well that she would never have acted as Judge Green had maintained she did. This contradicted interview notes of the State Bar made some months earlier. Sanai was acquitted on that charge.

42. There is only one remaining charge, relating to Sanai's enforcement of the judgment for costs. Further prosecution of that charge was stayed by the State Bar Court in case Sanai succeeded in overturning that ruling by other means.

43. As of 2015, Court Counsel had completely failed to disbar Sanai, and the State Bar proceedings, if resumed, threatened to expose the entire decade long conspiracy to punish Sanai for his conduct toward Grimes.

44. Court Counsel then focused on a lawsuit where Sanai is acting as an attorney, *UGC,* as the next avenue to force Sanai's destruction. This case was selected because the appellate proceedings were directed to Division 8 at which Judge Grimes sits. This case was a collection case for a defaulted commercial lease. When the original trial court judge retired, she was replaced by Judge Brazile (now presiding judge) with Judge David Sotelo, a former prosecutor utterly ignorant of civil or business law. Though Judge Sotelo is absolutely incompetent in matters of civil law, he was promised a transfer to the civil department so long as he took all steps necessary to have Sanai punished by sanctions or jail. Together he worked with Judge Mark Borenstein to craft a plan. The plan was to impose sanctions against Sanai for allegedly filing a motion that, in fact, he never filed; bar the staying of such order while it was on appeal, and then prosecute Sanai for contempt. The defendant's lawyer, STAUB, was solicited for

-15-

COMPLAINT

this task.  Judge Borenstein, on his own motion, imposed sanctions  in February of 2016, $3,600 to Staub and $1,000 to the Court for allegedly including in an ex parte motion for a stay (which was granted) a request for sanctions that was unsupported by any arguments or showings of law.  The ex parte motion did indeed lack any arguments or factual showing, because the notice of motion, the motion itself, the memorandum of points and authorities, and the declaration were silent as to any request for sanctions.  The amount imposed totaled less than $5,000; any award greater than $5,000 is directly appealable.  California law bars awarding sanctions or other relief to non-parties—by published case law, any sanctions must be awarded for the benefit of the client. Nonetheless the sanctions were awarded to the benefit of STAUB.

45.      However, (on information and belief) STAUB's clients objected to the *UGC* case becoming controlled by BENNETT.  STAUB filed a motion to be relieved as counsel.  This meant that STAUB was no longer counsel to the party, and he was not a party.  California case law bars STAUB from having any role in the proceedings once he is removed as counsel.  In order to keep him in the case, in December 2017 Judge Borenstein appointed STAUB as a special prosecutor to charge Sanai with contempt in *UGC*.

46.      California case law provides that a party charged with contempt has all of the rights of a criminal defendant, whether the contempt is civil or criminal, except that the right to jury trial only applies if the potential penalty includes jail time of greater than six months.  California law also provides that a party charged with contempt may attack the validity of the order which the defendant is charged with violating.

47.      In *UGC* Sanai has sought his *Brady* rights of disclosure of documents plus made requests for disclosure of documents using the mechanisms of civil subpoena, criminal subpoena, and mandatory discovery under the Penal Code.  MCINTIRE was engaged by the Superior Court and Judge Grimes to resist all such requests.   As MCINTIRE represents the Superior Court and one of the justices on the Court of Appeal, he is literally dictating the results of the motions.

48.      Sanai has sought the files of BENNETT and the non-public files of the Superior Court and Judge Grimes related to *UGC*  and facts identified above.  The position of the Court, as articulated by MCINTIRE are as follows:

A.   Determination of whether or not Justice Borenstein's original ruling and continued adjudication of the case meet the minimum requirements of impartiality under California law and federal due process are not "appropriate" for this proceedings and cannot be raised.

B.   After originally arguing that Cal. Evidence Code §703.5 applied and barred judicial testimony (which testimony it concedes includes judicial statements in writing, whether public or private), the position has now switched and it is argued that Cal. Evidence Code §703.5 does NOT apply and therefore no records can be disclosed or testimony taken—no argument is made about the records or communications created by BENNETT or received by him.

C.   There are no discovery procedures which can require a Superior Court or a judge to provide documents or give testimony under California law.

49.   STAUB, who was appointed by Judge Borenstein as Special Prosecutor, refuses to make any disclosures of information in his records under *Brady* or California's statutory discovery disclosure, which requires disclosure of real evidence "relevant to the matter."  STAUB denies that there can be any exculpatory evidence because Sanai is obviously guilty.  STAUB further states that no trial at all should be made and that Plaintiff should be held in summary contempt.

50.   Trial is set for March 21, 2018.

**FIRST CAUSE OF ACTION**

**RELIEF UNDER 42 U.S.C. §1983**

(By Sanai as Against Defendants and Does 1 through 10, inclusive)

51.   Plaintiff hereby incorporates by this reference paragraphs 1 through 50 as if set forth in full.

52.   The proper *Ex Parte Young* defendant in a federal civil rights cause of action where a Plaintiff seeks disclosure of evidence in a criminal case are the government lawyers.  The contempt proceedings in *UGC* have been directed by BENNETT with the assistance of NGUYEN, who prepared the order initiating contempt proceedings on Judge Borenstein's motion and

appointed STAUB as Special Prosecutor.  BENNETT (with the assistance of NGUYEN) directs the activities of STAUB as Special Prosecutor and  MCINTIRE on issues of discovery and preventing challenges to Judge Borenstein's actions on due process grounds in *UGC.*

53.     To the extent that the contempt proceedings are deemed to be criminal proceedings or quasi-criminal proceedings under federal law, BENNETT, STAUB, NGUYEN and MCINTIRE have directly denied, and conspired to deny, Sanai his rights under *Brady v. Maryland*.  BENNET, NGUYEN and MCINTIRE have also conspired to deny Sanai his right to obtain evidence, and under the Compulsory Process Clause from the state government's records, and have prevented and are preventing Sanai from obtaining such evidence through statutory notices to appear and subpoenas duces tecum.  As MCINTIRE instructs Judge Borenstein how to rule, MCINTIRE in effect denies Sanai this constitutional right.  BENNETT, assisted by NGUYEN, in turns instructs MCINTIRE what to say.

54.     To meet standards of due process, Sanai has the right to challenge judicial decisions, and the participation of judicial officers in making decisions, if a reasonable person would find a dangerous probability of a lack of impartiality.  Defendants BENNETT, STAUB, NGUYEN and MCINTIRE deny Plaintiff Sanai this right.  As MCINTIRE instructs Judge Borenstein how to rule as dictated by BENNETT (with some assistance from NGUYEN), MCINTIRE in effect denies Sanai this constitutional right on his own.

55.     In addition to the rights applicable to a defendant in a federal criminal or quasi-criminal proceeding, California law guarantees every defendant in a contempt proceeding the same rights as a criminal defendant in California state court except as to jury trials, where the right is more circumscribed.   This includes the right to compulsory process under the federal and state Compulsory Process clauses and the right to *Brady* disclosures and statutory criminal discovery. California allows statutory criminal discovery, and California law allows a person to attack the validity of an order in an contempt proceeding whether or not he has done so at an earlier time,, as the California Supreme Court has rejected the "collateral bar rule".  Both United States Supreme Court precedent and California precedent allow a person accused of contempt of court to raise the

defense that the underlying order was not constitutional for violation of substantive or procedural constitutional rights.

56.     Defendants BENNETT, STAUB, NGUYEN and MCINTIRE deny Sanai his right to equal protection of the law of California, treating Sanai as a "Class of One." In particular, in *UGC* Sanai is denied his right to Compulsory Process, his right to discovery under the Penal Code, *Brady* disclosures, and the right to challenge the validity of the order he is accused of violating on grounds that the judge and court which issued it would be deemed, by an impartial observer knowing all the facts, to be infected with a dangerous probability of a lack of impartiality.

57.     For a dozen years BENNETT, guided by Judge and now Justice Grimes (as to whom he still claims to represent) sought to rig the *Sanai v. Saltz* case so that Sanai would lose it at the trial court level.  These efforts to date have been defeated by Justice Perluss of the Second Appellate District, Division 7, to whose Court the case has been assigned since 2001.   BENNETT sought to have Sanai disbarred, but this failed due to the rulings of the Chief Judge of the State Bar Court, who held the first part of the trial, dismissed all but one of the charges after the State Bar prosecutor rested, and stayed proceedings on the remainder.  Now BENNETT, instructing NGUYEN, MCINTIRE and, indicrectly STAUB, are seeking to find Sanai guilty of contempt for failing to pay sanctions under an order based on a fictional action that Sanai never took in *UGC*.  The conduct of BENNETT, STAUB, NGUYEN and MCINTIRE  in UGC is arbitrary, capricious, and taken with actual malice for purposes of harassing Sanai and is in complete bad faith.

58.     The award of sanctions to STAUB, their enforcement after STAUB ceased to represent anyone in the litigation, and the contempt proceedings violate more than a dozen firmly established rules of California's substantive and procedural law.  However, for purposes of this lawsuit, SANAI only seeks damages and injunctive relief to require BENNETT, STAUB, NGUYEN and MCINTIRE to provide Sanai with the discovery sought to defend the contempt proceeding in *UGC* , and a temporary injunction upon the defendants to prosecute or take any other action in the contempt proceedings in *UGC* until the relevant documents are provided.

59.   As STAUB has been appointed as a Special Prosecutor and  thus has been given rights to appear in a case in which he is no a party and not an attorney for a party, he acting under color of state law.  However, as he denies he has *Brady* obligations, he is not entitled to prosecutorial immunity from damages.  BENNETT and NGUYEN do not claim to be acting as prosecutors or judges, so they lack immunity from damages for violations of civil rights. MCINTIRE does not claim to be acting as a prosecutor or a judge—instead, he is acting as a conduit to formally present arguments that STAUB cannot figure out on his own.

## SECOND CAUSE OF ACTION

### DECLARATORY JUDGMENT

((By Sanai as Against Defendants and Does 1 through 10, inclusive)

Does 1 through 10, inclusive)

60.   Plaintiff hereby incorporates by this reference paragraphs 1 through 50 and 52 through 57 as if set forth in full.

61.   Defendants  BENNETT, STAUB, NGUYEN and MCINTIRE on behalf of the Los Angeles County Superior Court in U*GC* deny that Sanai has the right to argue, or to obtain evidence to support the argument, that the orders and proceedings of Judge Borenstein on grounds that a reasonable observer with knowledge of the all facts would conclude that the orders and proceedings of Judge Borenstein show a dangerous probability of a lack of impartiality.  *Caperton v. A.T. Massey Coal Co., Inc.* (2009) 556 U.S. 868.

61.   Sanai seeks a declaratory judgment against  BENNETT, STAUB, NGUYEN and MCINTIRE that Sanai has right to attack Judge Borenstein's orders, and his conduct of the proceedings, on the grounds that there is a dangerous probability of a lack of impartiality and that the statutory guarantees of impartiality under Code Civ Proc. §170.1 et seq. have been violated.

62.   Sanai also seeks such a declaratory judgment  that under the equal protection clause of the Fourteenth Amendment, Sanai has all the rights of  criminal defendant in the contempt proceedings in *UGC*, including exculpatory information held by the Superior Court and its agents,

and held by Grimes, under *Brady v. Maryland* and the Compulsory Process Clause of the Constitution.

62.     A declaratory judgment is a prerequisite to obtaining injunctive relief against state court judges where such a judgment can be obtained at first.  42 U.S.C. §1983.  Here, a declaratory judgment can be obtained.  Accordingly Sanai first seeks such a declaratory judgment.

63.     There is no Rooker-Feldman abstention applicable to a case where a party seek to compel disclosure of evidence, even if such disclosure might effect a criminal court judgment. *Skinner v. Switzer* (2011) 562 U.S. 521.

64.     There is no *Younger* Abstention because the defendants have explicitly contended, and Judge Borenstein has ruled, that constitutional arguments regarding the absence of impartiality of Judge Borenstein may not be raised to attack any of his prior rulings and no evidence may be obtained to support such rulings.  *See Middlesex County Ethics Comm. v. Garden State Bar Assn* (1982) 457 U. S. 423, 432 (1982). Here Plaintiff is not seeking to halt the contempt proceedings permanently, but rather to require that the proceedings give Sanai an adequate opportunity to raise federal arguments.  That means obtaining all evidence not subject to California statutory privilege that supports Sanai's contention that Sanai and his client have not had an impartial tribunal.

65.     The second reason that there is no *Younger* abstention is that these proceedings follow a pattern of bad faith harassment, in which BENNETT has attempted for over a decade to use private legal proceedings as a cudgel to injure Sanai.   BENNETT, on behalf of the Superior Court, has repeatedly inserted himself into proceedings in Washington State and in the Superiro Court, turning opposing counsel into his catspaws and appearing personally, or engaging litigation counsel, to effectively become a party in several lawsuits.

**WHEREFORE,** Plaintiff Cyrus Sanai respectfully demand the following relief on behalf of himself:

<u>On the First Cause of Action</u>

1.    Damages of at least $100,000 against each of the Defendants;

2.    A temporary restraining order and preliminary injunction enjoining BENNETT, STAUB, NGUYEN and MCINTIRE and any successors thereto from prosecuting the contempt proceedings against Sanai pending disposition of this lawsuit;

3.    A permanent injunction requiring BENNETT, STAUB, NGUYEN and MCINTIRE, and any custodian of documents of the entities on whose behalf they act or have acted to disclose all documents relevant to the facts set forth above;

4.    Pre-judgment interest; and

5.    Reasonable costs incurred in this action and attorney fees.


<u>On the Second Causes of Action</u>

1.    A declaratory judgment providing that Sanai has the right to obtain and present evidence and obtain testimony of judicial officers to attack the validity of any orders issued by any sate court judge regarding *UGC*; and

2.    Reasonable costs incurred in this action.


Dated: March 14, 2017


                              By:  _/s/CYRUS SANAI_____
_____
                                   CYRUS SANAI
                                   SANAIS
                                   In pro per.

COMPLAINT